No. 19-56004

# In the
# United States Court of Appeals
# for the Ninth Circuit

◆

STEVEN RUPP, et al.,

*Plaintiffs–Appellants*,

v.

XAVIER BECERRA, in his official capacity as
Attorney General of the State of California,

*Defendant–Appellee.*

◆

On Appeal from the United States District Court
for the Central District of California
Case No. 8:17-cv-00746-JLS-JDE

◆

**BRIEF OF *AMICI CURIAE* FIREARMS POLICY COALITION, FIREARMS POLICY FOUNDATION, SECOND AMENDMENT FOUNDATION, MADISON SOCIETY FOUNDATION, CALIFORNIA GUN RIGHTS FOUNDATION, AND INDEPENDENCE INSTITUTE IN SUPPORT OF APPELLANTS AND REVERSAL**

◆

GEORGE A. MOCSARY
UNIVERSITY OF WYOMING
COLLEGE OF LAW
1000 East University Avenue
Department 3035
Laramie, WY 82071
(307) 766-5262
gmocsary@uwyo.edu
*Not admitted in this Court

JOSEPH G.S. GREENLEE
*Counsel of Record*
FIREARMS POLICY COALITION
1215 K Street, 17th Floor
Sacramento, CA 95814
(916) 378-5785
jgr@fpchq.org

[Additional counsel listed on inside cover]

DAVID B. KOPEL
INDEPENDENCE INSTITUTE
727 East 16th Avenue
Denver, CO 80203
(303) 279-6536
david@i2i.org

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amici Curiae* make the following statements:

**Firearms Policy Coalition** has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

**Firearms Policy Foundation** has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

**Second Amendment Foundation** has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

**Madison Society Foundation** has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

**California Gun Rights Foundation** has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

**Independence Institute** has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

/s/ *Joseph G.S. Greenlee*
Joseph G.S. Greenlee
*Counsel of Record*

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF CONTENTS .................................................................ii

TABLE OF CITED AUTHORITIES .........................................iv

STATEMENT OF *AMICI CURIAE* ..................................... 1

CONSENT TO FILE ....................................................................... 2

SUMMARY OF ARGUMENT .................................................. 3

ARGUMENT ................................................................................... 6

  I.   *Heller* held that the Second Amendment protects arms "in common use." ......................................................................... 6

  II.  *Heller* explained that the Second Amendment does not protect "dangerous and unusual weapons." ............................... 7

  III. The banned arms are "in common use." ........................................ 8

    A.  All bearable arms are presumed to be protected by the Second Amendment. ....................................................... 8

    B.  The banned arms are common under any metric. ...................... 8

      1.  Total Number. ........................................................ 10

      2.  Number of Jurisdictions. ....................................... 11

      3.  Percentage of Total. .............................................. 13

      4.  The banned arms are owned in the millions, represent a substantial percentage of the nation's firearms, and are lawful federally and in 44 states. ..........................................14

    C.  The State did not carry its burden of proving that the banned arms are uncommon. ..........................................16

    D.  The popularity of arms for the purpose of self-defense, rather than their utility for that purpose, is dispositive. ...................18

    E.  If Second Amendment protection depended on how often firearms were *used* in self-defense, safer communities would have fewer rights. ...................................................... 20

    F.  "Common use" is not limited to self-defense, it includes all lawful purposes.........................................................................21

IV.  The banned arms are not "dangerous and unusual.".....................23

V.  Bans on constitutionally protected arms are categorically invalid.
.....................................................................................................26

VI.  The two-part test was designed to resolve issues not directly
addressed by *Heller*, and is thus inapplicable to the prohibition of
constitutionally protected arms......................................................29

CONCLUSION ..........................................................................................31

CERTIFICATE OF COMPLIANCE........................................................33

CERTIFICATE OF SERVICE................................................................34

# TABLE OF CITED AUTHORITIES

## Cases

*Andrews v. State,*
   50 Tenn. 165 (1871) ............................................................. 22

*Bauer v. Becerra,*
   858 F.3d 1216 (9th Cir. 2017) ............................................ 26

*Caetano v. Massachusetts,*
   136 S. Ct. 1027 (2016) .................................................. passim

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ..................................................... passim

*Duncan v. Becerra,*
   265 F. Supp. 3d 1106 (S.D. Cal. 2017) .......................... 13, 17

*Edenfield v. Fane,*
   507 U.S. 761 (1993) ............................................................. 20

*Ezell v. City of Chicago,*
   651 F.3d 684 (7th Cir. 2011) ("*Ezell I*") ........................... 23

*Ezell v. City of Chicago,*
   846 F.3d 888 (7th Cir. 2017) ("*Ezell II*") .......................... 23

*Friedman v. City of Highland Park, Illinois,*
   784 F.3d 406 (7th Cir. 2015) ................................... 17, 19, 23

*Fyock v. Sunnyvale,*
   779 F.3d 991 (9th Cir. 2015). ............................................ 11

*Heller v. District of Columbia,*
   670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*") ................ 10, 14

*Hollis v. Lynch,*
   827 F.3d 436 (5th Cir. 2016) ..................................... 9, 10, 12

*Kolbe v. Hogan,*
   849 F.3d 114 (4th Cir. 2017) (en banc) ......................... 11, 13

iv

*Luis v. United States,*
    136 S. Ct. 1083 (2016) ........................................................ 22

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) .................................................... passim

*Moore v. Madigan,*
    702 F.3d 933 (7th Cir. 2012) ............................................. 28

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo,*
    804 F.3d 242 (2d Cir. 2015) ("*NYSRPA I*") ............................... 8, 10, 13

*Rupp v. Becerra,*
    401 F. Supp. 3d 978 (C.D. Cal. 2019) ................................. 4, 21, 23, 25

*Silvester v. Harris,*
    843 F.3d 816 (9th Cir. 2016) ............................................. 26

*Staples v. United States,*
    511 U.S. 600 (1994) ..................................................... 25

*United States v. Chovan,*
    735 F.3d 1127 (9th Cir. 2013) ........................................... 29

*United States v. Miller,*
    307 U.S. 174 (1939) ................................................. 4, 6, 9, 24

*Virginia v. Black,*
    538 U.S. 343 (2003) ...................................................... 8

*Worman v. Healey,*
    922 F.3d 26 (1st Cir. 2019) ........................................... 10, 13

## Constitutional Provisions

U.S. Const. amend. I ....................................................... 20

U.S. Const. amend. II .................................................. passim

## Statutes and Regulations

Conn. Gen. Stat. Ann. § 53-202c .......................................... 14

Md. Code Ann., Crim. Law § 4-303 ........................................................ 14

Md. Public Safety § 5-101(r)(2) ............................................................ 14

N.J. Stat. Ann. § 2C:39-1 ..................................................................... 14

N.J. Stat. Ann. § 2C:39-5 ..................................................................... 14

N.Y. Penal Law § 265.00 ...................................................................... 14

N.Y. Penal Law § 265.02(7) .................................................................. 14

## Other Authorities

BLACK'S LAW DICTIONARY (6th ed. 1990) .................................................. 8

Johnson, Nicholas J., et al., FIREARMS LAW AND THE SECOND
AMENDMENT: REGULATION, RIGHTS, AND POLICY (2014) ...................... 15

Kopel, David B. & Greenlee, Joseph G.S., *The Federal Circuits' Second
Amendment Doctrines*, 61 ST. LOUIS U. L.J. 193 (2017) ............... 23, 29

Mocsary, George A., *Insuring the Unthinkable*, NEW APPLEMAN ON INS.:
CURRENT CRITICAL ISSUES IN INS. L. 1 (Spring 2018) ......................... 19

Zywicki, Todd J. & Sanders, Anthony B., *Posner, Hayek & the Economic
Analysis of Law*, 93 IOWA L. REV. 559 (2008) .................................... 19

## STATEMENT OF *AMICI CURIAE*

**Firearms Policy Coalition ("FPC")** is a nonprofit membership organization that defends constitutional rights—including the right to keep and bear arms—and promotes individual liberty. FPC engages in direct and grassroots advocacy, research, legal efforts, outreach, and education. FPC has a special interest in this case, because the issue presented is germane to litigation and research in which FPC is currently engaged.

**Firearms Policy Foundation ("FPF")** is a nonprofit organization that serves its members and the public through charitable programs including research, education, and legal efforts, with a focus on constitutional rights. FPF has a special interest in this case, because the issue presented is germane to litigation and research in which FPF is currently engaged.

**Second Amendment Foundation ("SAF")** is a nonprofit foundation dedicated to protecting the right to arms through educational and legal action programs. SAF has over 650,000 members, in every State of the Union. SAF organized and prevailed in *McDonald v. City of Chicago*.

1

**Madison Society Foundation ("MSF")** is a nonprofit corporation based in California. MSF seeks to promote and preserve the right to keep and bear arms by offering education and training to the public.

**California Gun Rights Foundation** is a nonprofit organization dedicated to defending the constitutional rights of California gun owners and educating the public about federal, state, and local laws.

**Independence Institute** is a nonpartisan public policy research organization founded on the eternal truths of the Declaration of Independence. The Institute's *amicus* briefs in *District of Columbia v. Heller* and *McDonald v. City of Chicago* (under the name of lead *amicus* Int'l Law Enforcement Educators & Trainers Association (ILEETA)) were cited in the opinions of Justices Breyer (*Heller*), Alito (*McDonald*), and Stevens (*McDonald*).

## CONSENT TO FILE

All parties have consented to the filing of this brief.[1]

---

[1] No counsel for a party in this case authored this brief in whole or part. No party or counsel for a party contributed money intended to fund the preparation or submission of this brief. No person other than *amici* and their members contributed money intended to fund the preparation or submission of this brief.

2

## SUMMARY OF ARGUMENT

The issue is whether a ban on arms in common use violates the Second Amendment. The Supreme Court has addressed restrictions on specific types of arms four times—more than any other Second Amendment issue. Under Supreme Court precedent, analyzing arms prohibitions is straightforward. If arms are "in common use," they are constitutionally protected and cannot be banned. If arms are "dangerous and unusual"— and thus not common—they are not constitutionally protected.

The two-part test employed by this Court for Second Amendment challenges was developed to resolve issues not directly addressed by the Supreme Court. This Court recognized that *District of Columbia v. Heller*, 554 U.S. 570 (2008) involved bans that warrant something beyond the highest level of heightened scrutiny. The two-part test is therefore inapplicable to laws declared categorically unconstitutional by *Heller*. In cases involving such laws, Supreme Court precedent is binding.

In addition to determining the proper approach, the Supreme Court has explained what is *improper* for evaluating bans on common arms: the Court twice rejected interest-balancing tests, and it made clear that

Second Amendment protection applies regardless of a weapon's suitability for military use.

The district court understood *Heller* as providing that "the M-16—and weapons 'like' it—can be banned as dangerous and unusual weapons," regardless of commonality. *Rupp v. Becerra*, 401 F. Supp. 3d 978, 986 (C.D. Cal. 2019). But arms cannot be both common and unusual.[2] *Heller* instead explained that the Second Amendment continues to protect arms in common use, even if that means some modern militia arms—like M-16s—may be unprotected if they are unusual.

Additionally, the banned firearms are not like M-16s. While the district court found semiautomatic and automatic firearms indistinguishable, the Supreme Court has found a significant distinction between the two.

Although the district court determined that the banned arms are ill-suited for defensive purposes, the Supreme Court's common use test ensures that the people, rather than the government, decide what arms

---

[2] *Heller*, 554 U.S. at 627 ("the sorts of weapons protected were those 'in common use at the time.' . . . [T]hat limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'") (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)).

they may use for self-defense. The district court found that the banned arms are infrequently used in self-defense, but constitutionality depends on how often people select—not use—guns for lawful purposes. And the district court dismissed other lawful purposes besides self-defense, but the Supreme Court has made clear that the Second Amendment protects all lawful purposes.

Justice Alito's *Caetano v. Massachusetts* concurrence confirmed that "the pertinent Second Amendment inquiry is whether [the arms in question] are commonly possessed by law-abiding citizens for lawful purposes today." 136 S. Ct. 1027, 1032 (2016) (Alito, J., concurring) (emphasis omitted). The banned arms are owned in the millions, represent a substantial percentage of the nation's firearms, and are lawful federally and in at least 44 states. By any metric, the banned arms are common, and necessarily not dangerous and unusual. The ban thus violates the Second Amendment.

# ARGUMENT

## I. *Heller* held that the Second Amendment protects arms "in common use."

*Heller* specifically addressed "*what* types of weapons" the right to keep and bear arms protects. *District of Columbia v. Heller*, 554 U.S. 570, 624 (2008) (emphasis in original). The Court held that the right protects arms that are "typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625. In other words, "the sorts of weapons protected were those 'in common use at the time.'" *Id.* at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)).

In the founding era, "when called for militia service able-bodied men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." *Id.* at 624 (quoting *Miller*, 307 U.S. at 179) (brackets omitted). "The traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense." *Id.* Because "weapons used by militiamen and weapons used in defense of person and home were one and the same," protecting arms in common use is "precisely the way in which the Second Amendment's operative clause furthers the purpose announced in its preface." *Id.* at 625 (citations omitted).

6

Thus, "the pertinent Second Amendment inquiry is whether [the arms] are commonly possessed by law-abiding citizens for lawful purposes *today*." *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1032 (2016) (Alito, J., concurring) (emphasis in original).

## II. *Heller* explained that the Second Amendment does not protect "dangerous and unusual weapons."

*Heller* noted that the Second Amendment's protection of arms in common use "is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" 554 U.S. at 627. Indeed, a weapon that is "unusual" is the antithesis of a weapon that is "common"—so an arm "in common use" cannot also be "dangerous and unusual."

Additionally, "this is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano*, 136 S. Ct. at 1031 (Alito, J., concurring) (emphasis in original). Thus, in *Caetano*, "[b]ecause the Court rejects the lower court's conclusion that stun guns are 'unusual,' it does not need to consider the lower court's conclusion that they are also 'dangerous.'" *Id.* (Alito, J., concurring).

7

### III.  The banned arms are "in common use."

### A. All bearable arms are presumed to be protected by the Second Amendment.

"The Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Heller*, 554 U.S. at 582. "In other words, it identifies a presumption in favor of Second Amendment protection, which the State bears the initial burden of rebutting." *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 257 n.73 (2d Cir. 2015) ("*NYSRPA I*"); *see Virginia v. Black*, 538 U.S. 343, 369 (2003) (Scalia, J., concurring in part, concurring in the judgment in part, and dissenting in part) (defining "prima facie evidence" as "sufficient to establish a given fact" and "if unexplained or uncontradicted . . . sufficient to sustain a judgment in favor of the issue which it supports.") (quoting BLACK'S LAW DICTIONARY 1190 (6th ed. 1990)). Thus, in *NYSRPA I*, the Second Circuit struck a ban on a pump-action rifle because the state focused exclusively on semiautomatic weapons and "the presumption that the Amendment applies remain[ed] unrebutted." 804 F.3d at 257.

### B. The banned arms are common under any metric.

The Supreme Court has not precisely defined "common use." In *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court struck

8

bans on handguns, "the most popular weapon chosen by Americans for self-defense in the home." *Heller*, 554 U.S. at 629. A detailed examination of their commonality was unnecessary. In *Miller*, the district court had quashed the indictment in question, so neither party had an opportunity to present evidence regarding the commonality of short-barreled shotguns. Because the commonality of such arms was not within judicial notice, the Supreme Court remanded. The *Caetano* concurrence declared that "[t]he more relevant statistic is that hundreds of thousands of Tasers and stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 States." 136 S. Ct. at 1032 (Alito, J., concurring) (quotations and brackets omitted). Because "stun guns are widely owned and accepted as a legitimate means of self-defense across the country," they were common enough for protection under the Second Amendment. *Id.* at 1033 (Alito, J., concurring).

In the federal circuit courts, "[e]very post-*Heller* case to grapple with whether a weapon is 'popular' enough to be considered 'in common use' has relied on statistical data of some form, creating a consensus that common use is an objective and largely statistical inquiry." *Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016) (quotations omitted).

9

Nevertheless, "[t]here is considerable variety across the circuits as to what the relevant statistic is." *Id.*

**1. Total Number.**

"Some courts have taken the view that the total number of a particular weapon is the relevant inquiry." *Id.*

The Second Circuit determined that banned semiautomatic rifles "are 'in common use' as that term was used in *Heller*" because "Americans own millions of the firearms that the challenged legislation prohibits." *NYSRPA I*, 804 F.3d at 255.

The D.C. Circuit determined that banned semiautomatic rifles were "indeed in 'common use'" because "[a]pproximately 1.6 million AR-15s alone have been manufactured since 1986."[3] *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("*Heller II*").

The First Circuit "assume[d], albeit without deciding," that banned semiautomatic firearms were in common use where "the plaintiffs have shown that, as of 2013, nearly 5,000,000 people owned at least one semiautomatic assault weapon." *Worman v. Healey*, 922 F.3d 26, 35–36 (1st Cir. 2019).

---

[3] "AR" is short for "ArmaLite," the original manufacturer of the rifle.

The Fourth Circuit decided it "need not answer" whether banned semiautomatic firearms were "in common use," but acknowledged evidence that "there were at least 8 million" of the banned firearms "in circulation in the United States by 2013." *Kolbe v. Hogan*, 849 F.3d 114, 128, 136 (4th Cir. 2017) (en banc).

This Court determined that a district court did not abuse its discretion by finding that "at a minimum, magazines are in common use" where the plaintiffs "presented sales statistics indicating that millions of magazines, some of which [] were magazines fitting Sunnyvale's definition of large-capacity magazines, have been sold over the last two decades in the United States." *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015).

## 2. Number of Jurisdictions.

When the Supreme Judicial Court of Massachusetts upheld a ban on stun guns because the "number of Tasers and stun guns is dwarfed by the number of firearms," the *Caetano* concurrence explained that such a test is untenable because "[o]therwise, a State would be free to ban *all* weapons *except* handguns, because 'handguns are the most popular weapon chosen by Americans for self-defense in the home.'"

11

*Caetano*, 136 S. Ct. at 1032 (Alito, J., concurring) (quoting *Heller*, 554 U.S. at 629). The *Caetano* concurrence identified "the more relevant statistic" as the raw number of arms and the number of jurisdictions in which they are lawful.[4] *Id.* (Alito, J., concurring).

The Fifth Circuit followed this approach (among others) in *Hollis*. Whereas the *Caetano* concurrence determined stun guns were "in common use" because hundreds of thousands had been sold nationwide and they were lawful in 45 states, 136 S.Ct. at 1032 (Alito, J., concurring), the Fifth Circuit determined machineguns were unprotected: only 175,977 were in existence and "34 states and the District of Columbia prohibit possessing machineguns." *Hollis*, 827 F.3d at 450.[5]

A California district court—later affirmed by this Court—recently applied the number-of-jurisdictions test and determined that magazines over 10 rounds "are common" because they are "[l]awful in at least 43

---

[4] In striking a ban on carrying arms in public, the Seventh Circuit was attentive to the laws of other jurisdictions, and repeatedly noted that the challenged statute was the most restrictive in the nation. *Moore v. Madigan*, 702 F.3d 933, 940, 941, 942 (7th Cir. 2012). By banning arms based on make and model as well as various features, California's ban is arguably the most restrictive in the nation as well.

[5] The *Hollis* court's state law count was incorrect, but it demonstrates the use of state laws in assessing "common use."

states and under federal law." *Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1118 (S.D. Cal. 2017), *aff'd*, 742 F. App'x 218 (9th Cir. 2018).

### 3. Percentage of Total.

Some courts consider the percentage an arms type constitutes of the total nationwide arms stock. The Second Circuit found banned semiautomatic rifles to be "in common use" when they "represent about two percent of the nation's firearms." *NYSRPA I*, 804 F.3d at 255.

The First Circuit assumed that banned semiautomatics were in common use where they represented "three percent of guns in the United States" and "one percent of Americans own such a weapon." *Worman*, 922 F.3d at 35.

The Fourth Circuit found that the banned semiautomatic weapons comprised nearly three percent of the firearms owned nationwide. *Kolbe*, 849 F.3d at 126. Additionally, "Rifles based on the AR-15 and AK-47 accounted for approximately 20% of firearm sales in the United States in 2012, and the banned assault weapons comprised between 18% and 30% of all regulated firearm transfers in Maryland in 2013." *Id.* at 128.

The D.C. Circuit held banned semiautomatic rifles "in common use" because "in 2007 this one popular model [AR-15] accounted for 5.5

percent of all firearms, and 14.4 percent of all rifles, produced in the U.S. for the domestic market." *Heller II*, 670 F.3d at 1261.

### 4. The banned arms are owned in the millions, represent a substantial percentage of the nation's firearms, and are lawful federally and in 44 states.

By any metric, the banned semiautomatics here are "in common use." Appellants introduced evidence showing that Americans possess 9 to 15 million of the banned arms. E.R.X 1754. A 2015 survey of 6,521 hunters and shooters "found that 47.1% respondents owned an AR platform modern sporting rifle." E.R.X 1751–52. In 2017, "modern sporting rifles were reported to be the most popular selling long gun, accounting for 17.9% of overall gun sales." E.R.X 1751–52. And by 2013, "AR-15 rifles accounted for 19% of all guns manufactured in the United States and 29% of all rifles manufactured in the United States." E.R.X 1754.

Law-abiding citizens may possess some semiautomatic rifles in all 50 states and any semiautomatic rifle in 44 states.[6] And every semiautomatic rifle is lawful under federal law. The banned arms are

---

[6] Only five states other than California ban some semiautomatic rifles: Connecticut (Conn. Gen. Stat. Ann. §53-202c), Maryland (Md. Code Ann., Crim. Law §4-303; Md. Public Safety §5-101(r)(2)), Massachusetts (Mass. Gen. Laws Ann. ch. 140, § 131M), New Jersey (N.J. Stat. Ann. §§2C:39-1, 5), and New York (N.Y. Penal Law §§265.00, .02(7)).

therefore "in common use." Indeed, no sister circuit has found to the contrary.

What is more, the Supreme Court has demonstrated that the specific make and model of a particular arm need not be popular to be protected. Rather, the arm must be among "the *sorts* of weapons" or "of the *kind*" that are "in common use at the time." *Heller*, 554 U.S. at 624 (emphasis added), 627 (emphasis added). It is the function of the arm rather than the make and model of the arm that matters.

Neither *Heller* nor *McDonald* mentioned either the subcategory of handgun (revolver versus pistol), *see* Nicholas J. Johnson, et al., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY, Online Chapters, 417–23 (2014),[7] or the specific make and model of the handgun that Mr. Heller sought to possess. And the *Caetano* concurrence focused on both stun guns and Tasers—handheld electroshock weapons—as a "*class* of arms," 136 S. Ct. at 1031 (Alito, J., concurring) (emphasis added), rather than the specific stun gun that Ms. Caetano was convicted of possessing.

---

[7] http://firearmsregulation.org/www/FRRP_2012.pdf.

15

Because the Supreme Court performs the commonality analysis at the "sort," "kind," or "class" level, it is no answer to say that California is targeting merely an unprotected subcategory of rifles. Rather, it would be most consistent with Supreme Court precedent for the commonality analysis to focus on whether long guns are in common use.[8]

### C. The State did not carry its burden of proving that the banned arms are uncommon.

The State failed to prove that the banned firearms are uncommon. The State argued that the banned arms are uncommon because "approximately 166,640 assault rifles [are] registered *in California*." Def's Mem. of Points and Auth. 14 (emphasis added). The State underestimates what constitutes "common." The *Caetano* concurrence makes clear that "hundreds of thousands . . . *nationwide*" is sufficient.

---

[8] Analogizing to *Heller*, long guns are at the same level of generality as handguns. The next more-general level would be firearms. The next more-specific level would be rifles (the ban of which plaintiffs here are challenging). The more-specific level after that would be semiautomatic rifles.

Analogizing to *Caetano*, long guns are at the same level of generality as handheld electroshock weapons (the level at which the *Caetano* concurrence conducted its analysis). The next more-general level would be electroshock weapons. The next more-specific level would be stun guns (the ban of which Ms. Caetano was challenging).

136 S.Ct. at 1032 (Alito, J., concurring) (emphasis added). And it is inappropriate to look only to the state whose regulation is being challenged. "To the extent [the firearms] may be now uncommon within California, it would only be the result of the State long criminalizing the buying, selling, importing, and manufacturing of these [firearms]. To say the [firearms] are uncommon because they have been banned for so long is something of a tautology. It cannot be used as constitutional support for further banning." *Duncan*, 265 F. Supp. 3d at 1118; *see Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 409 (7th Cir. 2015) ("[I]t would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity."). The commonality of such firearms must be measured by what is owned throughout the rest of the country. After all, handguns were not in common use by ordinary, law-abiding citizens within the District of Columbia when the *Heller* Court struck the District's thirty-three-year ban on the possession of handguns.

17

Because the evidence here shows the banned arms are "in common use," and because the State failed to prove otherwise, the semiautomatic firearms California bans are constitutionally protected arms.

### D. The popularity of arms for the purpose of self-defense, rather than their utility for that purpose, is dispositive.

The district court was persuaded that "the semiautomatic rifles within the AWCA's scope are ill-suited for self-defense." *Rupp*, 401 F.Supp.3d at 989. But the relevant inquiry is whether the arms are commonly *selected* for that purpose. As Justice Stevens explained, "[t]he Court struck down the District of Columbia's handgun ban not because of the *utility* of handguns for lawful self-defense, but rather because of their *popularity* for that purpose." *McDonald*, 561 U.S. at 890 n.33 (Stevens J., dissenting) (emphasis in original).

In *McDonald*, the Supreme Court explained why it struck the handgun ban in *Heller*: "we found that this right applies to handguns because they are the most preferred firearm in the nation to 'keep' and use for protection of one's home and family. Thus, we concluded, citizens must be permitted to use handguns for the core lawful purpose of self-defense." *McDonald*, 561 U.S. at 767–68 (quotations, citations, and

18

brackets omitted). Because handguns are "preferred," they "must be permitted."

It is for the people, not the state, to decide which arms are preferred for self-defense. Each person chooses a self-defense arm based on his or her "particular circumstances of time and place." George A. Mocsary, *Insuring the Unthinkable*, NEW APPLEMAN ON INS.: CURRENT CRITICAL ISSUES IN INS. L. 1 (Spring 2018) (quoting Todd J. Zywicki & Anthony B. Sanders, *Posner, Hayek & the Economic Analysis of Law*, 93 IOWA L. REV. 559, 561–62, 568 (2008)). The individual is in an advantaged position to determine which arm best suits his or her self-defense needs. What matters is whether an arm is commonly chosen by the People for that purpose. Indeed, "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636. "To limit self-defense to only those methods acceptable to the government is to effect an enormous transfer of authority from the citizens of this country to the government—a result directly contrary to our constitution and to our political tradition." *Friedman*, 784 F.3d at 413 (Manion, J., dissenting); *see also Caetano*, 136 S. Ct. at 1033 (Alito, J., concurring) (expressing disapproval over "the safety of all Americans [being] left to

the mercy of state authorities who may be more concerned about disarming the people than about keeping them safe.").

In the First Amendment context, "the general rule" is "that the speaker and the audience, not the government, assess the value of the information presented." *Edenfield v. Fane*, 507 U.S. 761, 767 (1993). Just as the People have the right to determine the value of the information they exchange, they have the right to determine the defensive value of the arms they keep and bear.

### E. If Second Amendment protection depended on how often firearms were *used* in self-defense, safer communities would have fewer rights.

The State argues that the banned firearms are unprotected because they "are not commonly *used* for lawful self-defense." Def's Mem. of Points and Auth. 1 (emphasis added).

Unfired firearms are protected by the Second Amendment just as unread books are protected by the First Amendment. If Second Amendment protection depended on the number of actual defensive uses, low-crime communities would have fewer rights because their arms would be needed for self-defense less often.

*Heller* did not attempt to quantify defensive handgun incidents. It focused, instead, on how commonly handguns were kept for self-defense. And millions of Americans keep the banned firearms for self-defense, as well as other lawful purposes.

### F. "Common use" is not limited to self-defense, it includes all lawful purposes.

The district court determined that the ban's burden on the Second Amendment is not severe because the banned arms are sometimes purchased for purposes other than self-defense, such as recreational target shooting. *Rupp*, 401 F. Supp. 3d at 989.

While arms often serve multiple purposes—arms purchased for target shooting may also be kept for self-defense—self-defense is not the only purpose the Second Amendment protects. *Heller* explained that the right protects weapons "typically possessed by law-abiding citizens for *lawful purposes*," 554 U.S. at 625 (emphasis added), and that "[t]he traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes *like* self-defense," *id.* at 624 (emphasis added).

*Heller* approvingly quoted the Supreme Court of Tennessee stating that "the right to keep arms involves, necessarily, the right to use such

arms for all the ordinary purposes." *Id.* at 614 (quoting *Andrews v. State*, 50 Tenn. 165, 178 (1871)). And it acknowledged that "most [Americans in the founding era] undoubtedly thought [the right] even more important for self-defense and hunting" than militia service. *Id.* at 599. The dissent similarly recognized that "[w]hether [the Second Amendment] also protects the right to possess and use guns for nonmilitary purposes like hunting and personal self-defense is the question presented by this case." *Id.* at 636–37 (Stevens, J., dissenting).

*McDonald* summarized the "central holding in *Heller*: that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald*, 561 U.S. at 780; *see also Friedman v. City of Highland Park, Ill.*, 136 S. Ct. 447, 449 (2015) (Thomas, J., joined by Scalia, J., dissenting from the denial of certiorari) ("The overwhelming majority of citizens who own and use such rifles do so for lawful purposes, including self-defense and target shooting. Under our precedents, that is all that is needed . . . under the Second Amendment.") (citation omitted); *Luis v. United States*, 136 S. Ct. 1083, 1097–98 (2016) (Thomas, J., concurring) ("The right to keep and

bear arms . . . implies a corresponding right to . . . acquire and maintain proficiency in their use") (quotations and citations omitted).

Every federal circuit court of appeals to address the issue has found that the right protects other lawful purposes. *See* David B. Kopel & Joseph G.S. Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 ST. LOUIS U. L.J. 193, 204–07 (2017). Most notably, the Seventh Circuit twice struck restrictions on firing ranges for violating the Second Amendment. *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ("*Ezell I*"); *Ezell v. City of Chicago*, 846 F.3d 888 (7th Cir. 2017) ("*Ezell II*").

## IV. The banned arms are not "dangerous and unusual."

The district court understood *Heller* as providing that "the M-16—and weapons 'like' it—can be banned as dangerous and unusual weapons," regardless of commonality. *Rupp*, 401 F. Supp. 3d at 986. But if "the banned weapons are commonly owned . . . then they are not unusual." *Friedman*, 784 F.3d at 409. That is why protection for arms "in common use . . . is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'"—because there is no

overlap, arms cannot be both common and unusual. *Heller*, 554 U.S. at 627.

Moreover, *Heller* was not stating that arms can be banned merely because they are like M-16s. Rather, *Heller* was explaining that the common use test applies regardless of a weapon's utility in the militia:

> It may be objected that if weapons that are most useful in military service—M-16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause. But as we have said, the . . . militia at the time of the Second Amendment's ratification . . . would bring the sorts of lawful weapons that they possessed at home to militia duty. It may well be true today that a militia, to be as effective as militias in the 18th century, would require sophisticated arms that are highly unusual in society at large. . . . But the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right.

554 U.S. at 627–28. In other words, the Second Amendment continues to protect arms in common use today—as it did at ratification—even if some modern militia arms are "highly unusual" and unprotected. "*Miller* and *Heller* recognized that militia members traditionally reported for duty carrying 'the sorts of lawful weapons that they possessed at home,' and that the Second Amendment therefore protects such weapons as a class,

24

*regardless of any particular weapon's suitability for military use*." *Caetano*, 136 S. Ct. at 1032 (Alito, J., concurring) (quoting *Heller*, 554 U.S. at 627) (emphasis added).

Nor is it accurate that "semiautomatic assault rifles are essentially indistinguishable from M-16s." *Rupp*, 401 F. Supp. 3d at 986. The district court dismissed the difference of M-16s being automatic firearms and the banned weapons being semiautomatic firearms as "a distinction without a difference." *Id.* at 987. The Supreme Court, however, found the distinction significant. Specifically discussing the AR-15, the Court explained that such semiautomatic weapons, which fire "only one shot with each pull of the trigger," "traditionally have been widely accepted as lawful possessions." By contrast, fully automatic firearms—M-16s and the like—have the "quasi-suspect character we attributed to owning hand grenades." *Staples v. United States*, 511 U.S. 600, 603 n.1, 611–12 (1994).

As explained above, the banned arms are among the most popular arms in the country. Being "in common use," they are necessarily *not* unusual, and therefore not "dangerous and unusual," regardless of their military utility or whether they are like M-16s.

## V.     Bans on constitutionally protected arms are categorically invalid.

As this Court has recognized, some firearm restrictions are so severe heightened scrutiny is inapplicable:

> A law that imposes such a severe restriction on the fundamental right of self defense of the home that it amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny. *Id.* at 961. That is what was involved in *Heller*. 554 U.S. at 628–29, 128 S.Ct. 2783. A law that implicates the core of the Second Amendment right and severely burdens that right warrants strict scrutiny. *See Chovan*, 735 F.3d at 1138. Otherwise, intermediate scrutiny is appropriate.

*Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016). *See also Bauer v. Becerra*, 858 F.3d 1216, 1222 (9th Cir. 2017) ("A law that . . . amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny . . . Further down the scale [is] . . . strict scrutiny. Otherwise, intermediate scrutiny is appropriate.").

Thus, "what was involved in *Heller*" is categorically invalid, *Silvester*, 843 F.3d at 821, "[f]urther down the scale" is strict scrutiny, *Bauer*, 858 F.3d at 1222, and "intermediate scrutiny is appropriate" for all other laws, *id.*

The issue here is the same as "what was involved in *Heller*." *Heller* held a ban on arms in common use—i.e., handguns—categorically invalid. Because handguns are common and thus constitutionally protected arms, "a complete prohibition of their use is invalid." 554 U.S. at 629. The Court applied no tiered scrutiny analysis, considered no social science evidence, included no data or studies about the costs or benefits of the ban, and expressly rejected the intermediate scrutiny–like balancing test proposed by Justice Breyer's dissent. After all, the Court explained, "[w]e know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach." *Id.* at 634.

In *McDonald*, the Supreme Court again held a handgun ban categorically invalid. And the Court again refused to adopt an interest-balancing approach to a ban on constitutionally protected arms:

> Municipal respondents assert that, although most state constitutions protect firearms rights, state courts have held that these rights are subject to "interest-balancing" and have sustained a variety of restrictions. In *Heller,* however, we expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing.

27

*Id.* at 785 (citation omitted). Also absent from *McDonald* was any examination of the usefulness of handguns in military service.

The Seventh Circuit recognized that "[b]oth *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right—like the handgun bans at issue in those cases, which prohibited handgun possession even in the home—are *categorically unconstitutional.*" *Ezell I*, 651 F.3d at 703 (emphasis added). The Seventh Circuit later held a prohibition on carrying arms in public categorically invalid, because it destroyed the right to self-defense outside the home. *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012). The Seventh Circuit appropriately dismissed the idea of a heightened scrutiny analysis for such a severe ban. *Id.* at 941 ("Our analysis is not based on degrees of scrutiny").

The *Caetano* concurrence confirmed this approach: "stun guns are widely owned and accepted as a legitimate means of self-defense across the country. Massachusetts' categorical ban of such weapons therefore violates the Second Amendment." 136 S.Ct. at 1033 (Alito, J., concurring); *see also Friedman*, 136 S. Ct. at 449 (Thomas, J., joined by Scalia, J., dissenting from the denial of certiorari) ("Under our

precedents, that [the arms are commonly used for lawful purposes] is all that is needed for citizens to have a right under the Second Amendment to keep such weapons.").

Similar categorical bright-line rules are common in constitutional jurisprudence. *See* Kopel & Greenlee, 61 ST. LOUIS U. L.J. at 303–04 (providing examples for the First, Fifth, Sixth, Eighth, Tenth, and Fourteenth Amendments).

### VI. The two-part test was designed to resolve issues not directly addressed by *Heller*, and is thus inapplicable to the prohibition of constitutionally protected arms.

This Court has adopted a two-part test for Second Amendment challenges. *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013). "The two-step Second Amendment inquiry we adopt (1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny." *Id.* at 1136–37. This test was developed and adopted throughout the federal circuit courts to resolve issues not directly addressed by *Heller*. *See Heller*, 554 U.S. at 635 ("since this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field"). For instance, this Court adopted the test to

29

resolve a challenge to a firearm ban applied to domestic violence misdemeanants. But the two-part test is precluded when a court reviews a law that is categorically unconstitutional under *Heller*, in which case the court is bound by Supreme Court precedent:

> Both *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right—like the handgun bans at issue in those cases, which prohibited handgun possession even in the home—are categorically unconstitutional. . . . For all *other* cases, however, we are left to choose an appropriate standard of review from among the heightened standards of scrutiny the Court applies to governmental actions alleged to infringe enumerated constitutional rights.

*Ezell I*, 651 F.3d at 703 (emphasis added).

The Supreme Court has addressed restrictions on specific types of arms four times—*Heller*, *McDonald*, *Caetano*, and *Miller*—and it has never once indicated that interest-balancing—such as a heightened scrutiny analysis—is appropriate. For arms prohibitions, the Court has twice expressly rejected such an approach. *Heller,* 554 U.S. at 628–35; *McDonald*, 561 U.S. at 785.

The district court, however, upheld the prohibition at issue here based on interest-balancing: "Plaintiffs may have legitimate interests in

possessing semiautomatic rifles within the AWCA's scope. However, California has permissibly *weighed those interests* against the weapons' propensity for being used for mass violence and concluded that the weapons' lawful value is drastically outweighed by the danger they pose to California citizens." 401 F.Supp.3d 978, 993 (emphasis added).

Applying interest-balancing tests to a prohibition of common arms directly contradicts Supreme Court precedent.

## CONCLUSION

The decision below should be reversed, and the ban on common arms should be held unconstitutional.

Respectfully submitted,

/s/ *Joseph G.S. Greenlee*
JOSEPH G.S. GREENLEE
  *Counsel of Record*
FIREARMS POLICY COALITION
1215 K Street, 17th Floor
Sacramento, CA 95814
(916) 378-5785
jgr@fpchq.org

GEORGE A. MOCSARY
UNIVERSITY OF WYOMING
COLLEGE OF LAW
1000 East University Avenue
Department 3035
Laramie, WY 82071
(307) 766-5262

gmocsary@uwyo.edu

DAVID B. KOPEL
INDEPENDENCE INSTITUTE
727 East 16th Avenue
Denver, CO 80203
(303) 279-6536
david@i2i.org

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 5,971 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point, proportionately spaced Century Schoolbook font.

Dated this 3rd day of February 2020.

/s/ *Joseph G.S. Greenlee*
Joseph G.S. Greenlee
*Counsel of Record*

33

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2020, I served the foregoing brief via the CM/ECF system for the United States Court of Appeals for the Ninth Circuit, which will distribute the brief to all attorneys of record in this case. No privacy redactions were necessary.

Dated this 3rd day of February 2020.

/s/ *Joseph G.S. Greenlee*
Joseph G.S. Greenlee
*Counsel of Record*